540 P.2d 1294

**AMERICAN BANK OF COMMERCE,**
Plaintiff-Appellant,

v.

Italo J. COVOLO, Oliver Marianetti, A. W. Dekker, George T. Harris, Jr., Lloyd Hurley, Joseph R. McNeany and Lawrence Wilkinson, Defendants-Appellees.

Arthur W. DEKKER et al.,
Plaintiffs-Appellees,

v.

**AMERICAN BANK OF COMMERCE,**
Defendant-Appellant.

No. 10025.

Supreme Court of New Mexico.

Sept. 16, 1975.

Rehearing Denied Oct. 7, 1975.

Coors, Singer & Broullire, Robert N. Singer, Henry G. Coors, IV, Albuquerque, for appellants.

Joseph R. McNeany, pro se.

Modrall, Sperling, Roehl, Harris & Sisk, John R. Cooney, Paul M. Fish, Albuquerque, for Marianetti and others.

Mark B. Thompson, III, Albuquerque, for Hurley.

## OPINION

STEPHENSON, Justice.

This appeal involves two consolidated cases in which the district court determined there was no liability on the part of the individual defendants to the American Bank of Commerce (the Bank) upon their guaranties of certain corporate notes and upon other promissory notes.

Desiring to enter the restaurant business, Italo's, Inc. (the Corporation) sought financing from the Bank. As part of the security for a $100,000 loan, the Bank took a first mortgage on the Corporation's real estate, a pledge of and second lien upon the liquor license of Italo Covolo, one of the Corporation's principal stockholders, and personal unconditional guaranties in the amount of $25,000 each, executed by stockholders, the defendants herein (the Guarantors). Thereafter, an additional $10,000 promissory note was executed by Mr. Harris on behalf of the Corporation, and Messrs. Harris, Hurley and Wilkinson also executed separate $4,000 personal notes to the Bank.

The Bank failed to perfect the security interest in the liquor license.[1] The Corporation fell upon evil times and declared bankruptcy. But for the Bank's failure to perfect its security interest in the liquor license, the proceeds of the bankruptcy would have been sufficient to extinguish the Guarantors' liabilities to the Bank.

The Bank sued the Guarantors on the guaranties to recover (1) interest, attorney's fees and costs due on the $100,000 note; (2) the same relief on the $10,000 note; and (3) from defendants Harris, Hurley and Wilkinson the unpaid principal balances, interest, attorney's fees and costs on the three $4,000 notes.

The defenses were essentially that (1) the $100,000 loan was intended by all parties to be secured, in part, by the lien on the liquor license and that by virtue of the Bank's failure to perfect the security interest, the Guarantors lost their right to subrogation and therefore their obligation to the Bank was terminated; (2) the $10,000 note was also intended to be secured by the liquor license and the Bank's omissions similarly discharged the Guarantors' liability on that note; and (3) the three $4,000 notes were intended by both the signators and the Bank to have been corporate obligations, also secured by the liquor license, and hence, unenforceable against the individual signators.

After trial, the district court adjudged the defendants absolved from all liability based upon the three foregoing defenses. The Bank appeals.

We will first deal with the rights and obligations of the parties in regard to the $100,000 note. We must consider the nature of the duty owed by the Bank to the Guarantors in protecting the latter's right of subrogation. The Guarantors argued, and the trial court found, that the Bank had a duty to the Guarantors to act in good faith, to exercise due care and to act in a commercially reasonable manner, and that failure to perfect the security interest was a breach of the duty thus discharging the Guarantors. It was successfully urged that this duty arises not only out of the general law of suretyship[2] but also out of the New Mexico Uniform Commercial Code, §§ 50A–1–101 to 9–507 N.M.S.A.1953 (hereinafter UCC §§ 1–101 to 9–507), specifically, §§ 1–201, 1–203 and 3–606.[3] Much of the Guarantor's argument is couched in terms of the Bank's "fiduciary" obligations to the Guarantors. No authority is cited to support the remarkable proposition that a bank owes fiduciary duties to its debtors and obligors. Notwithstanding the growth of consumerism, this nirvana is yet to be reached.

Section 3–606 codifies certain suretyship defenses. Under UCC § 3–606(1)(b), the surety is discharged when, without his consent, the creditor "unjustifiably impairs any collateral for the instrument." The Guarantors contend that the Bank's failure to perfect the security interest in the liquor license was an unjustifiable impairment because its value became unavailable to the Guarantors when the

1. See *State v. Scarborough*, 78 N.M. 132, 429 P.2d 330 (1967).

2. Several courts have held that under general suretyship principles there is an implied-in-law duty on a creditor to protect a guarantor's right of subrogation by perfecting the security interest, and if he fails to do so, the guarantor will be discharged to the extent of the loss occasioned thereby. *D. W. Jaquays & Co. v. First Security Bank*, 101 Ariz. 301, 419 P.2d 85 (1966); *Behlen Mfg. Co. v. First National Bank of Englewood*, 28 Colo. App. 300, 472 P.2d 703 (1970); *St. Paul Fire & M. Ins. Co. v. New Jersey Bank & T. Co.*, 104 N.J.Super. 367, 250 A.2d 57 (1969);

*First Nat. Bank In Grand Forks v. Haugen Ford, Inc.*, 219 N.W.2d 847 (N.D.1974).

3. Under UCC § 1–201(40), "surety" includes guarantors. UCC § 1–203 says: "Every contract or duty within this act [chapter] imposes an obligation of good faith in its performance or enforcement." UCC § 3–606(1) states: "The holder discharges any party to the instrument to the extent that without such party's consent the holder * * * (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse."

Bank's claimed priority was voided in bankruptcy.[4] We agree that the duty imposed on a creditor under UCC § 3–606(1)(b) encompasses the good faith obligation to exercise reasonable means to protect the rights of guarantors; in this case, by timely perfecting the security interest.[5] However, it is elementary that the rights of the guarantor as against the creditor are determined by the terms of the contract between them. *Behlen Mfg. Co. v. First National Bank of Englewood,* supra, n. 2; 38 Am.Jur.2d Guaranty § 126 (1968).

■■ The Bank argues that, under the guaranty contracts, the Guarantors waived any duty and thus any claim to a discharge under UCC § 3–606(1)(b).[6] The Guarantors do not deny they could waive the Bank's duty and thus limit the protection to which they might have otherwise been entitled to under the UCC, but they did convince the trial court to conclude, as a matter of law, that:

> * * * In any event, a bank holding security for indebtedness guaranteed by another may not waive or release such security except in a commercially reasonable manner, and a negligent waiver or release of security, which is not commercially reasonable and which damages

the guarantor by impairing rights of subrogation, discharges the guarantor to the extent of impairment notwithstanding a contractual right on the bank's part to waive or release the security, in the absence of a contractual provision clearly exempting the bank from its duty to act in good faith and with reasonable care as respects the security.

This legal conclusion is plainly not the law. The Guarantors have failed to cite a case so holding and we have discovered none. How the standard of commercial reasonableness came to be engrafted into UCC § 3–606 in this case escapes us. The term is used exclusively in Article Nine as the standard by which a creditor must dispose of repossessed collateral. UCC §§ 9–504(3) and 9–507(2).[7] Nowhere does it appear in Article Three. Furthermore, the evidence is clear that the Bank believed, though mistakenly, that the security interest in the liquor license had been properly perfected when it was filed with the Alcoholic Beverage Control Department in Santa Fe. This was apparently considered by the trial court to be commercially unreasonable and in bad faith. "Commercial reasonableness" had nothing to do with the matter. There obviously was not a lack of

---

4. Under UCC § 9–301(1)(b), an unperfected security interest is subordinate to the rights of a lien creditor who becomes such without knowledge of the security interest and before it is perfected. UCC § 9–301(3) includes within the definition of "lien creditor" " * * * a trustee in bankruptcy from the date of the filing of the petition * * *."

5. See *White v. Household Finance Corporation,* 302 N.E.2d 828 (Ind.Ct.App.1973) and *First Bank and Trust Company, Palatine v. Post,* 10 Ill.App.3d 127, 293 N.E.2d 907 (1973), both holding that impairment of collateral under UCC § 3–606(1) is not limited to depletion of the physical value of the collateral itself, but extends to impairment of the security interest in the collateral. See also J. White & R. Summers, Uniform Commercial Code § 13–14 at 434–35 (1972); Clark, Suretyship In the UCC, 46 Tex.L.Rev. 453, 461–62 (1968).

6. UCC §§ 1–102(3) and 3–606 allow waiver of a surety's defenses. Section 1–102(3) pro-

vides: "The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable." According to Comment 2 to UCC § 3–606, the consent which will bar discharge may take many forms and come at any time: "Consent may be given in advance, and is commonly incorporated in the instrument; or it may be given afterward. It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge.

7. See *Clark Leasing Corp. v. White Sands Forest Products, Inc.,* 87 N.M. 451, 535 P.2d 1077 (1975), regarding "commercial reasonableness" in its Article Nine context.

good faith on the part of the Bank,[8] although its omissions were arguably negligent.

There was no loan agreement or contract of broader compass touching the Guarantors' obligations, other than the continuing guaranties.[9] Since UCC § 3–606 allows a surety to waive his defenses and UCC § 1–102(3) allows the parties by agreement to determine the standards by which the performance of their good faith obligations are to be measured, the resolution of this case turns simply on reading and interpreting the provisions of the guaranty agreement to determine whether the guarantors should be relieved of liability under the general law of suretyship.

In construing these contracts, we are guided by the principle that a guarantor or surety is entitled to a strict construction of his undertaking, and his liability is not to be extended by implication beyond the express terms of the contract or its plain intent. *Shirley v. Venaglia*, 86 N.M. 721, 527 P.2d 316 (1974). The parties agree the contracts under considera-

tion are unconditional guaranties of payment.[10] See *Pavlantos v. Garoufalis*, 89 F.2d 203 (10th Cir. 1937).

From the documents, we observe that the Bank was not, as a prerequisite to the Guarantors' liability, obliged to take any security, although it had a right to do so. No provision of the guaranties requires the Bank to perfect security taken or otherwise deal with it in any particular way. The Guarantors waive their rights to subrogation, the very right they now claim was impaired, and waive and release any claims to the security and "any benefit of, and any right to participate in any security now or hereafter held by Bank." The Bank has the right to "waive and release" the security at any time without the waiver or release affecting the Guarantors' obligation to pay. We find nothing inherently unreasonable in the terms of the guaranty agreement.[11]

Though we do not go as far as some courts,[12] an examination of the language of the guaranties requires us to hold the Guarantors liable for the amount owed

8. UCC § 1–201(19) defines "Good faith" as "honesty in fact in the conduct or transaction concerned."

9. The pertinent provisions of the contract are paragraphs 4, 5 and 9. Paragraph (4) authorizes the Bank to * * * (b) take and hold security for the payment of this guaranty or the indebtedness guaranteed, and exchange, enforce, waive and release any such security; (c) apply such security and direct the order or manner of sale thereof as Bank in its discretion may determine; * * *." Paragraph (5) states: Guarantors waive any right to require Bank to (a) proceed against Borrowers; (b) proceed against or exhaust any security held from Borrowers; or (c) pursue any other remedy in Bank's power whatsoever. Guarantors waive any defense arising by reason of any disability or other defense of Borrowers or by reason of the cessation from any cause whatsoever of the liability of Borrowers. Until all indebtedness of Borrowers to Bank shall have been paid in full, even though such indebtedness is in excess of Guarantors' liability hereunder, Guarantors have no right of subrogation, and waive any right to enforce any remedy which Bank now has or any hereafter have against Borrowers, and waive any benefit of, and any right to participate in any security now or hereafter

held by Bank * * *." Under paragraph (9), "Guarantors agree to pay a reasonable attorneys' fee and all other costs and expenses which may be incurred by Bank in the enforcement of this Guaranty."

10. Under UCC § 3–416(1) "payment guaranteed" means "that the signer engages that if the instrument is not paid when due he will pay it according to its tenor without resort by the holder to any other party." The official comment makes clear that, under this section, "the liability of the endorser [guarantor] becomes indistinguishable from that of a co-maker." Uniform Commercial Code § 3–416 (1), Comment.

11. UCC § 1–102(3) requires standards of agreement not to be manifestly unreasonable.

12. *United States v. Klebe Tool & Die Co.*, 5 Wis.2d 392, 397, 92 N.W.2d 868, 871 (1958) held that "[a] guarantor of payment, as distinguished from a guarantor of collection, cannot avail himself of the defense that the creditor through negligence, or lack of due diligence, lost or dissipated the collateral furnished by the debtor." See also *Nation Wide, Inc. v. Scullin*, 256 F.Supp. 929 (D.N.J.1966), aff'd 377 F.2d 554 (3d Cir. 1967); *A & T Motors, Inc. v. Roemelmeyer*, 158 So.2d 567 (Fla.Ct.App.1963); *Schaffer v. Acklin*, 205 Iowa 567, 218 N.W. 286 (1928).

to the Bank. As the court said in *Etelson v. Suburban Trust Company*, 263 Md. 376, 283 A.2d 408, 410 (Ct.App.1971):

> It would be illogical to rule that the Bank had a duty to file the financing statement and its failure to do so released the endorsers, when under the endorsement it could have released the collateral with impunity.

Where a guarantor or surety expressly and unequivocally consents to a waiver or release of his rights in the collateral, he will not be heard to complain of the failure of the guarantee to perfect the security interest therein in the first instance. *Joe Heaston Tractor & Imp. Co. v. Securities Accept Corp.*, 243 F.2d 196 (10th Cir. 1957); *Etelson v. Suburban Trust Company*, supra; *Lafayette Bank and Trust Co. of Suffern v. Silver*, 58 Misc.2d 891, 296 N.Y.S.2d 926 (App.T.1969). The cases relied upon by the Guarantors, except for *St. Paul Fire & M. Ins. Co. v. New Jersey Bank & T. Co.*, supra, n.2, a case with which we do not agree, are not to the contrary. Only in that case had the guarantor consented to an exchange, waiver or release of the collateral by the guarantee. See *D. W. Jaquays & Co. v. First Security Bank*, supra, n.2; *Behlen Mfg. Co. v. First National Bank of Englewood*, supra, n.2; *First Bank and Trust Company, Palatine v. Post*, supra, n.5; and *White v. Household Finance Corporation*, supra, n.5.

We turn to a consideration of the $10,000 note which was executed a year later. The Guarantors assert that the security documents in respect to the liquor license constitute the license as additional security for the $100,000 note and securing mortgage; that the latter mortgage secured other liabilities "whether now existing or hereafter arising;" and that inasmuch as the guaranties were continuing in nature, the $10,000 note was secured by the liquor license, and the Guarantors were absolved from liability for all of the reasons they advanced in respect to the $100,000 note.

What we have said regarding the $100,000 note disposes of the issues concerning the one for $10,000, but the facts concerning the latter lend themselves to an even simpler approach leading to the same result. The note upon its face specified that it was unsecured, and, incidentally, was guaranteed by a separate guaranty agreement on its reverse side. These facts, as a matter of law, dispose of the Guarantors' contentions concerning the $10,000 note.

> Where contracts are put into several instruments, each of which has a sensible meaning and may have full operation by itself, it would be a hazardous assumption to put them together for the purpose of making them mean, as one, differently from what they could in this separate state. Certainly, the court cannot do such violence to the intentions of the parties and the language in which they are expressed as to consolidate separate instruments where the effect of doing so would be to avoid an essential part of the contract. 17 Am.Jur.2d Contracts § 264 (1964).

Finally, we consider the three $4,000 notes which were first executed about eight months after the initial $100,000 note and renewed several times. The trial court found that the note proceeds were deposited to the Corporation's bank account "which was known to Bank"; the parties intended that the debt would be treated as "primarily" that of the Corporation; the debt was "secured" in the same manner as the $100,000 note; the makers would only be liable if the Bank were unable to collect from the Corporation; the Bank wrongfully refused to recognize or treat the note as a Corporation debt.

Both the Corporation and the makers made some payments. It appears that the Bank declined to make the loan to the Corporation. How the security arrangements we have described could have inured to the benefit of the individuals who were makers of the notes in their capacity as such is not explained.

The rights of the parties in respect to these notes are so clear as to merit no discussion. Disregarding the chaff, the

makers simply borrowed money on their own credit and turned the proceeds over to the Corporation. Their arrangements with the Corporation as to payment of the notes are of no interest to us. The notes were purely and simply the personal obligations of the makers. The court erred in holding otherwise.

The case is reversed and remanded to the district court. The trial court is directed to set aside the judgment from which this appeal is taken. The court is directed to make findings of fact and conclusions of law as to the unpaid principal balances of the three $4,000 notes, and as to accrued interest and attorney's fees in respect to all of the notes mentioned in this opinion. Whether additional evidence is to be received as to these matters, we leave to the trial court's discretion.

The trial court will thereupon enter judgment granting the Bank the relief summarized in the fourth paragraph of this opinion, and denying relief to the appellees on their various complaints and counterclaims.

The Bank is allowed $2,000 for the services of its attorneys on this appeal.

MONTOYA and SOSA, JJ., concur.