954 F.2d 774
 293 U.S.App.D.C. 343
 Kathleen Saunders WILLIAMS, Individually, and Katherine
Saunders Williams, Executrix of the Estate of
Elizabeth George Saunders, Deceased, Appellant,
v.
FEDERAL LAND BANK OF JACKSON, Federal Land Bank Association
of Jackson, and Farm Credit System Assistance
Board, Appellees.
 No. 90-5064.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 28, 1990.
Decided Feb. 4, 1992.
 
 Appeal from the United States District Court for the District of Columbia.
 Preston Davis Rideout, Jr., for appellant. With him on the brief and supplemental brief was A. Lee Abraham, Jr. Gina L. Bardwell, Greenwood, Miss., also entered an appearance for appellant.
 Matthew M. Collette, Atty., Dept. of Justice, Washington, D.C., for appellees. With him on the brief and supplemental brief for appellee Farm Credit System Assistance Bd. were Jay B. Stephens, U.S. Atty., and Anthony J. Steinmeyer, Atty., Dept. of Justice. Stewart A. Block, Washington, D.C., was on the brief and supplemental brief for appellees Federal Land Bank of Jackson and Federal Land Bank Ass'n of Jackson. Richard B. Dagen, Washington, D.C., also entered an appearance for appellees Federal Land Bank of Jackson and Federal Land Bank Ass'n of Jackson.
 [293 U.S.App.D.C. 344] Before MIKVA,* Chief Judge, and WILLIAMS and THOMAS,** Circuit Judges.
 Opinion for the Court filed by Circuit Judge WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 In 1981 Katherine Saunders Williams and her mother, Elizabeth George Saunders, used Runnymede Plantation, their 1400-acre farm in Leflore County, Mississippi, as security for a loan of $1,309,000. They borrowed this sum through the Federal Land Bank Association of Greenwood (predecessor in interest to defendant Federal Land Bank Association of Jackson), which serviced loans for the Federal Land Bank of New Orleans (predecessor in interest to defendant Federal Land Bank of Jackson).[1] Williams and Saunders farmed their land through boom times, then bust, and six years later they owed $1,236,016.50.
 
 
 2
 On March 17, 1987, Williams and Saunders told the Federal Land Bank Association of Jackson that they wanted to sell Runnymede Plantation to a Duncan Williams for $1,450,000, or about $999 an acre, and to use some of the proceeds to reduce their debt to $422,183.10. They proposed to secure the remaining debt with a lien on several other of their assets, including land worth, according to Williams and Saunders, $320,000. The Land Bank Association, on behalf of the Land Bank, and at the direction of the Farm Credit System Capital Corporation (according to Williams and Saunders), rejected the proposal.
 
 
 3
 Saunders died on April 12. On April 14 Williams told the Land Bank Association that she wanted to sell Runnymede and the highway tract together to a Jimmy Henderson for a total of $1,600,000, or about $903 an acre, and to use some of the proceeds to extinguish her debt. The Land Bank Association took the proposal under advisement. According to Williams, the Capital Corporation told the Land Bank Association to wait. On June 20 the Land Bank Association approved the offer on behalf of the Land Bank. The sale closed on July 17, and Williams paid off her debt in full.
 
 
 4
 On December 22, 1987, Williams brought this action in the Circuit Court of Leflore County, individually and as executrix of her mother's estate, against the Land Bank, the Land Bank Association, and the Capital Corporation, charging the defendants with various torts and breaches of contract arising from their response to the two offers. Williams asked for compensatory damages totaling $1,003,836.76. This included the $139,107.37 ($96 per acre) difference between the Duncan Williams and Jimmy Henderson bids, $175,672.17 for profits allegedly lost because the Capital Corporation's position created uncertainty which in turn blocked access to production financing, and $500,000 in damages for emotional distress.
 
 
 5
 On January 21, 1988, the Farm Credit System Assistance Board replaced the Capital Corporation as a defendant as a consequence of statutory changes,[2] and on April 1, the Assistance Board removed the case to the United States District Court for the [293 U.S.App.D.C. 345] District of Columbia. On May 20, the Farm Credit Administration, the independent agency atop the farm credit system, declared the Land Bank and the Land Bank Association insolvent and placed them in the hands of receivers. The defendants answered Williams's amended complaint and then moved to dismiss it for failure to state claims upon which relief could be granted. The district court granted the defendants' motion, Williams v. Federal Land Bank, 729 F.Supp. 1387 (D.D.C.1990), and Williams appealed. We heard argument and then ordered supplemental briefing on certain jurisdictional questions. We begin with them.
 
 
 6
 * * *
 
 
 7
 The statute establishing the Assistance Board provides:
 
 
 8
 Notwithstanding any other provision of law, any civil action ... to which the Assistance Board is a party shall be deemed to arise under the laws of the United States, and the United States District Court for the District of Columbia shall have exclusive jurisdiction over such. The Assistance Board may ... remove any such action ... from a State court to the United States District Court for the District of Columbia.
 
 
 9
 12 U.S.C. § 2278a-3(b). Congress's clear intention--to create federal jurisdiction over all cases to which the Assistance Board is a party--prevails if the Constitution permits.
 
 
 10
 Article III, section 2 provides that the judicial power "shall extend to all Cases ... arising under ... the Laws of the United States." These include cases to which a federal instrumentality is a party, on the theory that the provision creating the entity is potentially at issue in every such case. See Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738, 822-28, 6 L.Ed. 204 (1824). The Supreme Court has already found federal land banks and federal land bank associations to be federal instrumentalities. See Knox Nat'l Farm Loan Ass'n v. Phillips, 300 U.S. 194, 202, 57 S.Ct. 418, 422, 81 L.Ed. 599 (1937) (federal land bank association, for purposes of susceptibility to state court winding-up procedures); Federal Land Bank v. Priddy, 295 U.S. 229, 231-32, 55 S.Ct. 705, 706, 79 L.Ed. 1408 (1935) (federal land bank, for purposes of susceptibility to judicial process absent express congressional provision). As the Assistance Board was created and empowered by Congress to refinance the land banks, it would be surprising if, regardless of other characteristics, it were not also a federal instrumentality. Indeed, Congress has expressly declared it to be "a Federally chartered instrumentality of the United States", 12 U.S.C. § 2278a(a), and Congress is the sole source of "all the faculties and capacities which [it] possesses," Osborn, 22 U.S. at 825. Under the logic of Osborn, this would seem to be enough. For what it may be worth, however, we note a little of the very broad scope of federal involvement. The Board is directed by presidential appointees (two of whom are cabinet members); its officers and employees are "hired, promoted, compensated and discharged in accordance with title 5, United States Code", see, e.g., Pub.L. No. 101-161, Title V, 103 Stat. 981 (Nov. 21, 1989); it is exempt from most taxes, see 12 U.S.C. § 2278a-11; and the Treasury guarantees the principal of its bonds, see id. § 2278b-6. It seems clear that the Assistance Board is a federal instrumentality for purposes of finding under Osborn that actions to which it is a party arise under the federal law.
 
 
 11
 The Land Bank and the Land Bank Association argue that Williams's claims against them are moot, on the ground that they are not only bankrupt but so bereft of resources that general unsecured creditors have no chance whatever of being paid. See Federal Land Bank v. Federal Intermediate Credit Bank, 128 F.R.D. 182, 185 (S.D.Miss.1989) (indicating that general creditors of the Land Bank have no chance of recovery); Adams v. RTC, 927 F.2d 348, 354-55 & n. 16 (8th Cir.1991) (claim moot where it is absolutely certain that collection is impossible), aff'g 731 F.Supp. 352, 357 (D.Minn.1990); FSLIC v. Locke, 718 F.Supp. 573, 586-87 (W.D.Tex.1989) (claim against receiver moot where it has "no funds"). We need not address the mootness argument, however. Williams's claim [293 U.S.App.D.C. 346] against the Assistance Board is based on the premise that it tortiously induced the Land Bank and Land Bank Association to commit their alleged wrongs. As we reject that claim on the ground that there were no such wrongs, finding the other claims moot would not alter our decision.
 
 
 12
 * * *
 
 
 13
 Plaintiff asserts that Mississippi law controls. The defendants say that federal law is applicable, but they also argue that there is no difference between the federal and Mississippi law. Moreover, they cite United States v. Kimbell Foods, Inc., 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), suggesting that in invoking federal law they intend that its content is to be found, as in Kimbell, in state law. As we agree with the defendants that plaintiff loses under the law that she herself has invoked (Mississippi's), we need not sort out the possible arguments for use of federal common law.
 
 
 14
 In the first of the eight counts of her complaint, Williams charged the defendants with breaching their fiduciary duties when the Land Bank Association (on behalf of the Land Bank) rejected her first proposal to sell her plantation. Mississippi cases do not flatly rule out the possibility of finding mortgagees generally subject to a fiduciary duty to their mortgagors. For instance, the Mississippi supreme court has suggested that the two "are in a relationship of trust". See First American Nat'l Bank v. Mitchell, 359 So.2d 1376, 1380 (Miss.1978). But that case involved fraudulent misrepresentations by the mortgagee's officer, see id. at 1378-79, not conduct that could be attacked only as a breach of a heightened duty of care. And other opinions suggest that the court would ultimately refrain from creating such a duty. For example, in West Point Corp. v. New N. Miss. Fed. Sav. & Loan Ass'n, 506 So.2d 241, 244 (Miss.1986), that court declined to read the UCC's provision on impairment of collateral (Miss.Code Ann. § 75-3-606 (1972)) to create a duty in a mortgagee to look after or care for mortgaged real estate, and in doing so relied on American Bank of Commerce v. Covolo, 88 N.M. 405, 540 P.2d 1294 (1975), which holds that a bank does not owe a fiduciary duty to its debtors under the UCC. The court reasoned that the proposed duty would have an extremely "chilling effect" on readiness to loan, see West Point, 506 So.2d at 244, a consideration also at work here: the costs of lending would rise sharply if lenders were obliged to give their borrowers' interests the sort of priority inherent in a fiduciary duty. Compare Market Street Associates Ltd. Partnership v. Frey, 941 F.2d 588, 593-96 (7th Cir.1991). And in White v. Hancock Bank, 477 So.2d 265, 271 (Miss.1985), the court held that in the absence of a confidential relationship, a bank would have no fiduciary duty to its depositor requiring it to ascertain the validity of a check before routing it to the drawee bank. See generally Robert C. Williamson & Brenda Kay Tanner, Lender Liability in Mississippi: A Survey, Comparison and Comment, 57 Miss.L.J. 1, 21-35 (1987). See also Production Credit Ass'n v. Ista, 451 N.W.2d 118, 121 (N.D.1990) (Production Credit Association does not owe fiduciary duty to borrower/shareholder except under special circumstances). Williams alleges no facts suggestive of a special relationship; and she cites no cases supporting her claim that an agricultural cooperative owes a fiduciary duty to its members.
 
 
 15
 Williams's second count charged the defendants with breaching the loan agreement. One clause made the loan "subject to the Farm Credit Act of 1971 and all acts amendatory thereof or supplementary thereto," including, the parties agree, relevant administrative regulations. The Assistance Board argues that neither the statutes nor the regulations create enforceable duties, and it relies on cases that hold that no private right of action exists under the Farm Credit Act of 1971 or the Agricultural Credit Act of 1987. See Zajac v. Federal Land Bank, 909 F.2d 1181 (8th Cir.1990) (en banc) (citing cases). Assuming that to be correct, however, there would still be the possibility that by contract the Land Bank took on an enforceable obligation running parallel to the statutory and regulatory provisions. Cf. Mendel v. Production Credit Association of the Midlands, [293 U.S.App.D.C. 347] 62 F.2d 180, 183 (8th Cir.1988) ("even where a federal act does not create a private cause of action for violation of the standards it prescribes, it may be that conduct violating the standards of conduct will give rise to a state common law cause of action"). Here, however, even assuming Mississippi law would give that effect to the loan agreement,[3] plaintiff has failed to make out a violation of the statute or regulations.
 
 
 16
 Plaintiff's claim rests essentially on a vague statement in the "Loan Policies and Operations" of the farm credit system:
 
 
 17
 The objective shall be to provide borrowers with prompt and efficient service with respect to actions in such areas as ... partial release of security.... Procedures shall provide for ... prompt exercise of legal options to preserve the lender's collateral position or guard against loss.
 
 
 18
 12 CFR § 614.4510(d)(1). The gist of the claim appears to be that the defendants' rejection of the Duncan Williams proposal denied plaintiff "prompt exercise" of a right to "preserve [her] collateral position or guard against loss", and that their delay on the Henderson offer breached a duty to be "prompt".
 
 
 19
 In fact, however, a specific provision of the statute required the defendants to reject the Duncan Williams deal. The Farm Credit Act of 1971 as in effect when Williams sold her land stated that "[l]oans originated by a Federal land bank ... shall not exceed 85 per centum of the appraised value of the real estate security." 12 U.S.C. § 2017 (1982).[4] And the regulations specify that this minimum relation must prevail throughout the life of the loan, so that it would apply to the residual loan after a release of the original collateral. See 12 CFR § 614.4180(b) (1986) ("The outstanding loan balance on any loan shall not at any time during the life of the loan exceed 85 percent ... of the appraised value ... [of] the primary real estate security."). The sale to Duncan Williams would have brought the plaintiff's debt down to $422,183.10. For such a loan the statute would require real estate collateral of nearly $500,000, while the land plaintiff offered was worth only $320,000 by her own reckoning. The additional proffered collateral, as it was not in the form of land, obviously could not satisfy Congress's insistence on "real estate security". If the bromides of 12 CFR § 614.4519(d)(1) created any legally enforceable duties, they could not overcome the specifics of the statute.
 
 
 20
 Williams now argues that the defendants cannot invoke the 85% rule because they had repeatedly ignored it in the past. Even if the pattern were as Williams claims, we would reject the argument. Whatever Mississippi might do by way of incorporating statutory obligations into the contract, that incorporation could not extend to the point of requiring that a federal agency, having once or even many times violated its enabling statute, should thereafter be perpetually obliged to continue doing so. The extreme judicial reluctance to apply estoppel against the government arises out of a concern that otherwise negligent or dishonest officials could bring about violations of law by making misrepresentations. See Office of Personnel Management v. Richmond, 496 U.S. 414, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990). Plaintiff's proposed rule would engender illegality on a far greater scale, and for far less equitable justification.
 
 
 21
 Williams cites several cases for the rule that "what a party consistently does ... is the best evidence of what the contract requires him to do." But these cases just say that parties' conduct after the signing of what later proves to be an ambiguous contract may be used as evidence of their [293 U.S.App.D.C. 348] intent. See, e.g., Kight v. Sheppard Building Supply, Inc., 537 So.2d 1355 (Miss.1989). Williams does not allege that the defendants had previously refrained from applying the 85% rule against her. Perhaps she means that custom should inform our construction of the contract language. But in Mississippi the parole evidence rule does not permit extra-contractual evidence to nullify an unambiguous provision, see Cherry v. Anthony, Gibbs, Sage, 501 So.2d 416, 419 (Miss.1987), and Williams identifies no relevant ambiguity in the 85% rule.
 
 
 22
 As for the two months the defendants took to approve the Henderson transaction, we find no violation of any contractually imposed duty to be "prompt". Williams offers neither analysis nor case law to suggest that the period was not reasonable, given the scale and complexity of the transaction. Recycled as a claim of negligence in the fifth count, the delay claim fares no better.
 
 
 23
 Williams's third and fourth counts assert a want of good faith. She offers nothing to support the claim, however, except that the Duncan Williams offer that the defendants rejected was better for her and for them than the Henderson offer they approved. If true, that would prove that the defendants made a mistake (assuming they could lawfully have accepted the Duncan Williams transaction), not that they lacked good faith.
 
 
 24
 The other counts in the complaint fall in short order. Because none of the defendants did anything wrong with respect to the Duncan Williams offer and the Jimmy Henderson sale, they could not have committed the torts of intentionally or negligently inflicting emotional distress on the plaintiff (the sixth count), intentionally interfering with her contracts and business expectancies (the seventh), or intentionally exerting unlawful control over her business affairs (the eighth).[5]
 
 
 25
 * * *
 
 
 26
 Accordingly, we affirm the judgment dismissing the complaint.
 
 
 27
 So ordered.
 
 
 
 *
 Chief Judge Mikva did not participate in oral argument. The case was submitted to him on the briefs and on taped recordings
 
 
 **
 Former Circuit Judge Thomas, now an Associate Justice of the Supreme Court of the United States, was a member of the panel when the case was argued but did not participate in this opinion
 
 
 [1]
 By 1987, the year in which the events at issue occurred, the Federal Land Bank of Jackson had begun receiving financial help from the Farm Credit System Capital Corporation. See Farm Credit Amendments Act of 1985, Pub.L. No. 99-205, § 103, 99 Stat. 1678, 1680-87 (codified at 12 U.S.C. §§ 2216-2216k) (creating the Farm Credit System Capital Corporation to bail out financial institutions within the farm credit system), repealed by Agricultural Credit Act of 1987, Pub.L. No. 100-233, tit. II, § 207(a)(3), 101 Stat. 1568, 1607 (1988)
 
 
 [2]
 See Agricultural Credit Act of 1987, Pub.L. No. 100-233, tit. VI, § 6.0, 101 Stat. 1568, 1585 (1988) (codified at 12 U.S.C. § 2278a) (replacing the Capital Corporation with the Assistance Board); id. tit. VI, § 6.3(b), 101 Stat. at 1587 (codified at 12 U.S.C. § 2278a-3(b)) (giving the Assistance Board removal power); see also id. tit. IV, § 401, 101 Stat. at 1622 (merging Federal Land Banks and Federal Intermediate Credit Banks to form Farm Credit Banks)
 
 
 [3]
 We also continue our assumption that Mississippi law so construed would be applicable. Compare United States v. Little Lake Misere Land Co., 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973) (federal law governs acquisition of land by federal government for wildlife refuges when Louisiana law is "plainly hostile to the interests of the United States" and "would deal a serious blow to the congressional scheme," id. at 597, 93 S.Ct. at 2399)
 
 
 [4]
 For the current version, as amended by Agricultural Credit Act of 1987, see id. § 2018(a)(1)(A)
 
 
 [5]
 Williams cites no case in which a Mississippi court has recognized any such tort. Cf. Williamson & Tanner, supra, at 48 ("No published Mississippi decision has considered the imposition of liability on a lender for interference in its borrower's management relations. Given [a] lender['s] legitimate interests in the operations of its borrowers, Mississippi courts should think twice before [they do so].")