897 P.2d 1104

The CADLE COMPANY, INC., an Ohio corporation, Plaintiff–Appellant,

v.

WALLACH CONCRETE, INC., Defendant–Appellee and Third–Party Plaintiff,

v.

Pete GARZA, d/b/a Pete Garza Construction, Third–Party Defendant.

No. 22164.

Supreme Court of New Mexico.

May 31, 1995.

Cynthia A. Fry, Albuquerque, Templeman and Crutchfield, C. Barry Crutchfield, Lovington, for appellant.

Gary Don Reagan, P.A., Mark Terrence Sanchez, R.E. Richards, P.A., R.E. Richards, Hobbs, for appellee.

## *OPINION*

BACA, Chief Justice.

Appellant The Cadle Company, Inc. (Cadle) appeals from a judgment entered in favor of Appellee Wallach Concrete, Inc. (Wallach), concluding Cadle was not a holder in due course and therefore was subject to the defenses asserted by Wallach against collection on a promissory note. We address the following issues on appeal: (1) Whether the trial court erred in concluding Cadle did not qualify as a holder in due course of a promissory note and accompanying guaranty and (2) whether the trial court erred in determining the Federal Deposit Insurance Corporation (FDIC) breached its duty of good faith and commercial reasonableness and that such breach was attributable to Cadle. We note jurisdiction under SCRA 1986, 12–102(A)(1) (Repl.Pamp.1992), reverse, and remand.

## I.

On October 11, 1984, third-party Appellee Pete Garza (Garza) executed a promissory note (the "1984 Note") in favor of Moncor Bank (Moncor) in the amount of $32,846.82. On the same day, Wallach executed a continuing corporate guaranty (the guaranty) on the same Garza debt. The guaranty agreement stated that the "Guarantors waive any right to require Bank to (a) proceed against Borrowers; [or] (b) proceed against or exhaust any security held from Borrowers," and provided that the Bank could bring an action for the debt against Wallach "whether or not an action is brought against [Garza]." Final payment on the note ultimately was due January 9, 1985. On January 7, and January 22, 1985, Garza made respective payments of $5000. Also on January 22, the maturity date on the note was extended to April 9, 1985. On April 10, 1985, the maturity date on the note was again extended, this time to July 9, 1985. On August 5, Wallach made a payment of $3705.14.

On August 6, 1985, Garza executed a second promissory note (the "1985 Note") renewing the 1984 Note in the amount of $21,980.08. The 1985 Note was due November 4, 1985. Garza gave Moncor a security interest in a 1978 Ford dump truck (the dump truck), a 1978 John Deer backhoe tractor with a trailer (the backhoe), and a continuing corporate guaranty from Wallach.

On or about August 30, 1985, due to insolvency, Moncor indorsed and transferred the 1984 Note[1] and corresponding guaranty to the Federal Reserve Bank. The indorsement stated "Pay to the order of Federal Reserve Bank." The FDIC, in its receiver capacity, acquired the 1984 Note and guaranty. On April 21, 1986, the FDIC contacted Garza to notify him of the assignment of the 1984 Note and asked for payment in full. Garza, however, was unable to pay. On August 19, 1986, therefore, the FDIC contacted Wallach as personal guarantor of the 1984 Note. On August 28, 1986, Wallach responded but was told the FDIC would try to contact Garza again and would thereafter contact Wallach again. On September 17, 1986, the FDIC contacted Wallach, notifying him that because Garza had filed for bankruptcy it was requesting immediate payment from Wallach. The next day Wallach contacted the FDIC and offered to settle the balance of the loan by turning over the dump truck and backhoe that he had received from Garza. On October 10, 1986, the FDIC contacted Wallach to acknowledge Wallach's offer of the dump truck and backhoe. On October 29, 1986, the FDIC again contacted Wallach to say it was requesting an appraisal of the dump truck and backhoe and would contact him again when the appraisal was available. The appraisal was completed by November 18, 1986, with the equipment appraising for $5800. The FDIC, however, did not contact Wallach again.

On March 14, 1988, the FDIC finalized a bulk sale to Cadle of promissory notes and credits including the 1984 Note and corresponding guaranty. Cadle paid the FDIC $1200 for the 1984 Note and, after unsuccessfully attempting to recover on Wallach's guaranty, filed this action.[2] The trial court dismissed the action pursuant to the so-called "closed-door statute," NMSA 1978, § 53–17–20(A) (Repl.Pamp.1983), which requires foreign corporations that transact business in New Mexico to obtain a certificate of authority as a prerequisite to filing suit in this state. This Court reversed and remanded, conclud-

---

1. A "renewal" re-establishes the contract evidenced by the original note for another period of time. It evidences the same indebtedness. *First Nat'l Bank v. Abraham*, 97 N.M. 288, 291, 639 P.2d 575, 578 (1982). We refrain from commenting on the legal ramifications of Moncor's apparent failure to endorse and transfer the 1985 renewal note to the Federal Reserve Bank—neither party has raised nor briefed the issue. We proceed, however, with the assumption that the general rule applies. This rule is that when an obligator defaults on his obligation under renewal, the holder may sue either on the renewal note or on the original note unless there has been a novation. *Thompson v. Chrysler First Bus. Credit Corp.*, 840 S.W.2d 25, 29 (Tex.Ct.App.1992).

2. Plaintiff's Exhibit No. 7 reveals that Cadle based its suit on the original amount of the 1984 Note less $13,705 in total payments plus calculated interest. Because the 1985 Note is a renewal on the 1984 Note and contained a new maturity date, Cadle should have sued for, and calculated interest on, the amount of the 1985 Note.

ing the statute does not apply because Cadle did not "transact business" within the state. *Cadle Co., Inc. v. Wallach Concrete, Inc.*, 115 N.M. 556, 558, 855 P.2d 130, 132 (1993). On remand and after trial, the court entered a judgment in favor of Wallach, concluding that Cadle was not a holder in due course because the 1984 Note was acquired from the FDIC as part of a bulk transaction and had been dishonored. The trial court also concluded that the FDIC breached its duty to act in good faith in dealing with Wallach and was commercially unreasonable by failing to liquidate the dump truck and backhoe, and attributed that breach to Cadle. Thus the court precluded Cadle from collecting on the full amount of the 1984 Note. The trial court awarded Cadle $1200 plus interest. Cadle now appeals the trial court's judgment.

## II.

First, we address whether the trial court erred in concluding Cadle does not qualify as a holder in due course. Cadle argues the trial court disregarded the law that affords preferential status to the FDIC as a holder in due course. Further, as a successor in interest of the 1984 Note, Cadle argues it is afforded the same preferential status. We agree the FDIC may be afforded preferential status as a holder in due course. We also agree that a subsequent holder of a negotiable instrument taken from the FDIC may be afforded special status as a holder in due course. Application of holder-in-due-course status to Cadle in this case, however, presumes that the 1984 Note, a negotiable instrument, was properly negotiated. We find the promissory note was not properly negotiated. Moreover, even if we were to find the 1984 Note properly negotiated and holder-in-due-course status to apply, we do not agree that this special status bars Wallach from asserting defenses.

## A.

■ Cadle argues that the trial court erred when it concluded Cadle was not a holder in due course of the 1984 Note by

ignoring the law that affords preferential status to the FDIC and subsequent holders.

■ "The federal holder in due course doctrine bars the makers of promissory notes from asserting various 'personal' defenses against the FDIC in connection with purchase and assumption transactions involving insolvent banks." *Campbell Leasing, Inc. v. FDIC*, 901 F.2d 1244, 1248 (5th Cir.1990). A holder in due course of a negotiable instrument takes the instrument free from any personal defense or claim that the maker may assert.[3] NMSA 1978, § 55–3–305(b) (Repl.Pamp.1993). Among other requirements for holder-in-due-course status, *see* § 55–3–302(a)(2) to (g), the holder must take the instrument "(i) for value, (ii) in good faith, (iii) without notice that the instrument is overdue or has been dishonored ..., (iv) without notice that the instrument contains an unauthorized signature ..., (v) without notice of any claim to the instrument ..., and (vi) without notice that any party has a defense or claim in recoupment...." Section 55–3–302(a)(2). Additionally, a holder does not acquire rights as a holder in due course if the instrument was purchased "as part of a bulk transaction not in [the] ordinary course of business of the transferor...." Section 55–3–302(c).

■ The technical requirements for holder in due course are greatly relaxed, if not dispensed with altogether, when the FDIC acquires a note in a purchase and assumption transaction from a failed bank. *Campbell Leasing*, 901 F.2d at 1249. Technically, the FDIC cannot qualify as a holder in due course; it is not a "holder" as defined by NMSA 1978, Section 55–1–201(20) (Repl. Pamp.1993), and often, as receiver, it acquires notes by bulk transactions. Steven A. Weiss & Kenneth E. Kraus, *D'Oench Protection for Private Institutions Assisting the FDIC: A Necessary Component of the Thrift and Bank Bailout*, 108 Banking L.J. 256, 270 (1991). The principle of allowing the FDIC and its successors in interest to enjoy the benefits of a holder in due course is ground-

---

**3.** A holder in due course, however, is subject to "real" defenses that the maker may assert. Section 55–3–305(a)(1).

ed in the need for a uniform rule of immunity for the FDIC in order to perform its statutory function. *Gunter v. Hutcheson,* 674 F.2d 862, 869 (11th Cir.), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982), *and overruled on other grounds Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). The federal holder-in-due-course doctrine requires that, given the special circumstances that face the FDIC, state holder-in-due-course law does not apply. *Id.* A purchase and assumption transaction helps preserve stability of and confidence in the banking system and is the preferred method for resolving bank failures. *Id.* at 870. The FDIC may enter a purchase and assumption transaction, however, only where the cost of such a transaction is less expensive than paying insured depositors' claims. *Id.* It must make this determination with extraordinary speed if the going concern value of the failed bank is to be preserved. *Id.* at 865. Therefore, the FDIC must be able to rely on the integrity of books and records of the failed bank to estimate which assets, under possibly diverse state laws, would be collectible. *Id.* at 870; Marie T. Reilly, *The FDIC as Holder in Due Course: Some Law and Economics,* Colum.Bus.L.Rev. 165, 188–89 (1992). A uniform set of rules helps the FDIC perform its statutory function timely and more efficiently. "Thus, the FDIC ... enjoys holder in due course status in order to effectively perform its congressionally mandated function." *Campbell Leasing,* 901 F.2d at 1248–49.

The federal holder-in-due-course doctrine is consistent with and is actually derived from two other federal laws that afford the FDIC immunity from certain defenses. In *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the Supreme Court adopted a state law rule which immunizes the FDIC against certain defenses. The *D'Oench* doctrine precludes a borrower from asserting defenses against the FDIC based on secret or unrecorded side agreements between the bank and the borrower that are "designed to deceive the creditors or the public authority, or would tend to have that effect." *Id.* at 460, 62 S.Ct. at 681. Thus "[t]he purposes sought to be accomplished by [the FDIC] can be accomplished

only if it may rely on the integrity of banking statements and banking assets." *Id.* at 472, 62 S.Ct. at 686 (Jackson, J., concurring).

Similarly, 12 U.S.C. § 1823(e) (1988) immunizes the FDIC from an agreement that "tends to diminish or defeat the interest of the [FDIC]...." An agreement tends to have that effect if the requirements set forth in Section 1823(e) are not met: The agreement (1) must be written; (2) must be executed contemporaneously with the acquisition of the obligation by the bank; (3) must be approved by the bank's board of directors or a loan committee, with approval reflected in the committee's minutes; and (4) must have continuously been an official record of the bank. In other words, under the statute, if an agreement between a bank and borrower is not readily apparent to the FDIC in the bank records, the FDIC is immune from any defense that can be raised from that agreement. Reilly, *supra,* at 181–82. The scope of protection that Section 1823(e) affords the FDIC is broad and precludes any claim based on an agreement of which the FDIC is unaware if the agreement affects the value of the institution's assets. *Langley v. FDIC,* 484 U.S. 86, 94–95, 108 S.Ct. 396, 402–03, 98 L.Ed.2d 340 (1987); *see* Kraus, *supra,* at 265. In contrast, where the four requirements are satisfied, the FDIC has knowledge of the agreement and cannot claim special immunity.

Accordingly, we recognize that the FDIC enjoys holder-in-due-course status when it acquires notes in a purchase and assumption transaction.

■ Subsequent holders who acquire notes from the FDIC also enjoy holder-in-due-course status "whether or not they satisfy the technical requirements of state law." *Campbell Leasing,* 901 F.2d at 1249; *see* Kraus, *supra,* at 270 ("an assignee from the FDIC cannot technically be a holder in due course"). As we have already established, a purchase and assumption transaction is the preferred method for resolving bank failures. If subsequent purchasers were somehow subject to the personal defenses from which the FDIC is immune, there would be little, if any, incentive to acquire notes from the

FDIC. To hold otherwise "would emasculate the policy behind ... promoting purchase and assumption transactions. If holder in due course status did not run with the notes acquired by the FDIC in purchase and assumption transactions, the market for such notes would be smaller, which would have a deleterious effect on the FDIC's ability to protect the assets of failed banks." *FDIC v. Newhart*, 892 F.2d 47, 50 (8th Cir.1989). We recognize that "a subsequent purchaser ... stands in the shoes of the FDIC" for holder-in-due-course status. *Id.*

**B.**

 Wallach argues that because the 1984 Note was not properly negotiated, neither the FDIC nor Cadle qualifies as a holder in due course. Wallach relies on Section 55–3–205(a), and *Ballengee v. New Mexico Federal Savings & Loan Ass'n*, 109 N.M. 423, 425, 786 P.2d 37, 39 (1990). Section 55–3–205(a) provides "[i]f an indorsement is made by the holder of an instrument ... and the indorsement identifies a person to whom it makes the instrument payable, it is a 'special indorsement.' " The 1984 Note contains the indorsement "Pay to the order of Federal Reserve Bank," identifying the indorsee, thus qualifying as a special indorsement. "When specially indorsed, an instrument becomes payable to the identified person and *may be negotiated only by the indorsement of that person.*" *Id.* (emphasis added). "The principle here adopted is that a special indorser ... has the right to direct the payment and to require the indorsement of his indorsee as evidence of the satisfaction of own obligation." *Casarez v. Garcia*, 99 N.M. 508, 512, 660 P.2d 598, 602 (Ct.App.) (quoting the Official Comment to Section 55–3–204), *cert. denied*, 99 N.M. 578, 661 P.2d 478 (1983); *see also* 5A Ronald A. Anderson, *Uniform Commercial Code* § 3–204:1 (3d ed. 1994). Without such an indorsement, a transferee cannot qualify as a holder in due course. *See Ballengee*, 109 N.M. at 426, 786 P.2d at 40. There is no evidence in the record of an indorsement of the 1984 Note from the Federal Reserve Bank to the FDIC or to Cadle.

We are aware of no exception to this rule in the context of a purchase and assumption transaction by the FDIC. To the contrary, at least one jurisdiction applied this principle strictly in a similar context. In *Jernigan v. Bank One, Texas, N.A.*, 803 S.W.2d 774, 776 (Tex.Ct.App.1991), holder-in-due-course status was denied to a bank that purchased a promissory note from the FDIC. Just as in this case, "[t]he original note was negotiated to the Federal Reserve Bank via a special indorsement. ... An indorsement by the Federal Reserve was then necessary to complete the chain of indorsement to [the bank]." *Id.* The Federal Reserve Bank, however, failed to indorse the promissory note when it was transferred to the FDIC and then to the purchasing bank. Absent the requisite indorsement, the 1984 Note, although negotiable, was not "negotiated." Because the 1984 Note was not properly negotiated, Cadle cannot be afforded holder-in-due-course status and Wallach may assert any defense against Cadle that it could have asserted against the FDIC. *Cf. Ballengee*, 109 N.M. at 426, 786 P.2d at 40.

**III.**

 Even if we were to agree that the FDIC, and therefore Cadle, is afforded holder-in-due-course status, we could not agree that "preferential status" applies to this case. The federal holder-in-due-course doctrine protects the FDIC from personal defenses that are not evident by an examination of the books and records of the failed bank. As we have discussed, the idea is, in the interest of time, to free the FDIC from the potentially overwhelming task of examining each and every asset for possible claims or defenses. *See* Reilly, *supra*, at 188–89. That concern is not relevant here, however, with respect to the defenses that Wallach asserts.

> This special protection ... is afforded only when necessary to further the policy of promoting the stability of the nation's banking system by facilitating FDIC's smooth acquisition of assets in a purchase and assumption transaction. It is essential that the [FDIC] be able to acquire assets of a failed bank without fear of unknown defenses that may have been valid against the bank. *Such protections are not necessary where, as here, the conduct of FDIC itself gave rise to the defense of estoppel after the [FDIC] had acquired the asset.*

*FDIC v. Harrison*, 735 F.2d 408, 413 n. 6 (11th Cir.1984) (citation omitted and emphasis added). The defenses that Wallach asserts arose from the implicit agreements the FDIC allegedly made *after* it acquired the 1984 Note and guaranty. Consequently, any "preferential status" that Cadle argues it is entitled to receive as a result of having acquired the 1984 Note and guaranty from the FDIC cannot apply.

## A.

 We address whether the trial court erred by concluding the FDIC had "breached its obligation to act in good faith for dealing in a commercially reasonable manner in its dealings with [Wallach] in the enforcement of the promissory note and guarantee, and such breach is binding on and attributable to [Cadle]." Cadle argues there was no breach because Wallach, in its guaranty, "waive[d] any right to require [the] Bank to (a) proceed against [Garza]; (b) proceed against or exhaust any security held from [Garza]; (c) pursue any other remedy whatsoever." Wallach, on the other hand, argues that under Section 55–1–102(3), the defenses of breach of duty of good faith and commercial reasonableness cannot be waived.

> The effect of provisions of this act may be varied by agreement, except as otherwise provided in this act and except that the obligations of good faith, diligence, reasonableness and care prescribed by this act may not be disclaimed by agreement *but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.*

Section 55–1–102(3) (emphasis added). We agree with Wallach that Section 55–1–102(3) prohibits waiver of the defenses of breach of duty of good faith and reasonableness. We conclude, however, that by agreeing that Moncor could proceed against Wallach as guarantor without exhausting other collection procedures, the FDIC had no initial duty to accept Wallach's offer to turn the machinery over to the FDIC.

This Court has held this type of agreement not to be unreasonable. *American Bank of Commerce v. Covolo*, 88 N.M. 405, 540 P.2d 1294 (1975). *Covolo* involved a corporation that secured a loan with various guarantees executed by certain corporate shareholders. The loan was also secured by a liquor license, the lien to which the lending bank failed to perfect. *Id.* at 407, 540 P.2d at 1296. Upon default, the bank sought collection from the guarantors who, as a defense, asserted the bank had breached its duty of good faith and commercial reasonableness by failing to perfect the license, thus impairing the guarantors' right to subrogation. *Id.* This Court, construing Section 55–1–102(3), rejected the argument and concluded that, although the bank had a right to take security on the loan, it was under no duty to do so. *Id.* at 409, 540 P.2d at 1298. Without the obligation to take security, it was under no duty to the guarantors to perfect the security. *Id.* By agreeing that the bank had the right to waive and release security without the waiver affecting the guarantors' obligation to pay, the guarantors waived their right to sue for failure to perfect that security. *Id.*

The guaranty reveals that with Wallach's waiver, the FDIC was under no obligation to liquidate the backhoe tractor or the dump truck. The FDIC could not have breached a duty by not liquidating the backhoe tractor and dump truck because it had no duty in the first place.

## B.

 Wallach does not specifically raise equitable estoppel and detrimental reliance on appeal. Nonetheless, we deem this case worthy for such consideration. Wallach argues that the FDIC implied that liquidating the dump truck and backhoe would partially satisfy the debt. Toward that end, Wallach fully cooperated by making the equipment available for appraisal and by providing financial information. The FDIC, in fact, appraised the equipment at $5800 and informed Wallach that it "would be in touch to determine the manner in which this loan can be liquidated." The FDIC never contacted Wallach again, and the 1984 Note was sold for $1200. Significantly, Wallach cannot liquidate the dump truck and backhoe without the FDIC's, and now Cadle's, involvement. It is likely the market value of the equipment has decreased since 1986. Therefore, we remand to the trial court for a determination

of whether Wallach detrimentally relied on the FDIC's implied agreement to liquidate the dump truck and backhoe. *Cf. Taylor v. Allegretto,* 118 N.M. 85, 88, 879 P.2d 86, 89 (1994) (remanding for consideration of equities and determination of rate of prejudgment interest even though the issue had not been specifically disputed on appeal).

## IV.

In conclusion, we recognize that the FDIC may be afforded status as a holder in due course when it acquires promissory notes as part of a purchase and assumption transaction. Similarly, we recognize that where the FDIC is afforded status as a holder in due course, subsequent purchasers may also be afforded such status. We hold, however, that where a negotiable instrument is not properly negotiated, the transferee cannot be afforded holder-in-due-course status. We also hold that the federal holder-in-due-course doctrine does not apply to bar the defenses of breach of the duty of good faith and commercial reasonableness where the actions taken by the FDIC gave rise to the defenses. We hold that by waiving the requirement that Moncor, and therefore the FDIC, proceed against or exhaust any security held by Garza, Wallach agreed that the FDIC's decision not to do so could not be a breach of the duty of good faith and commercial reasonableness. Accordingly, there was no breach that could be attributable to Cadle. Finally, we remand to the trial court for a determination of whether Wallach detrimentally relied on the FDIC's implicit agreement to liquidate the dump truck and backhoe. If the court so finds, it may refuse to grant prejudgment interest on the appraisal amount, and may reduce the amount owing to Cadle by the appraised amount value less the current market value of that equipment. We reverse the judgment of the trial court and remand for judgment consistent herewith.

**IT IS SO ORDERED.**

FRANCHINI, J., and MATHIS, District Judge, concur.