556 P.2d 31

**FIRST NATIONAL BANK IN ALBUQUER-
QUE, Trustee, Plaintiff-Appellee
and Cross-Appellant,**

v.

**Robert B. DANEK, Sylvia B. Danek, Melvin
B. Porter, Patricia M. Porter, Richard R.
Danek, Lucille F. Danek and Telephonic,
Inc., a corporation, Defendants-Appellants
and Cross-Appellees.**

No. 10841.

Supreme Court of New Mexico.

Nov. 17, 1976.

**624**

Adams & Foley, Quincy D. Adams, Albuquerque, for defendants-appellants.

Rodey, Dickason, Sloan, Akin & Robb, Joseph J. Mullins, Albuquerque, for plaintiff-appellee.

## OPINION

EASLEY, Justice.

The plaintiff-appellee, First National Bank in Albuquerque (Bank), as trustee under a trust created by Frank A., Jr., and Mabel W. Hubbell, brought suit in the District Court of Bernalillo County for the balance due on a promissory note. After a nonjury trial, judgment was entered against the defendants, Robert B. and Sylvia B. Danek, Melvin B. and Patricia M. Porter and Telephonic, Inc. for $16,583.02, from which the defendants appeal. The plaintiff-appellee cross-appeals, alleging that Richard R. and Lucille F. Danek, parents of Robert Danek, are not released as guarantors on the note. We reverse the judgment of the trial court and deny the cross-appeal.

On November 28, 1969, the defendants signed a promissory note for $60,000.00 payable in various installments all to be paid within a one-year period. The interest was not specified but can be calculated from the schedule of payments to be a little less than 10% per annum on the unpaid balance. The note was originally signed by the Porters and the Robert Daneks and guaranteed by Robert Danek's parents, the Richard Daneks. A guaranty was later endorsed on the note by Telephonic, Inc. The loan was secured by shares of capital stock owned by Mr. Porter. This collateral was released after a payment of $30,000.00 on the note in August, 1970.

At the trial the Bank introduced parol evidence, to which no objection was made, which tended to alter the terms of the written instrument to show that the

money was primarily to be used to establish and operate the corporation and that the corporation was actually the maker and the individuals, the guarantors. This would have nullified the defense of usury.[1] Telephonic, Inc. was incorporated ten days after the note was executed.

Robert Danek testified that in addition to the note, a stock transaction was arranged so that Hubbell, the lender, could receive more than the interest that was indicated in the note. Danek and Porter arranged a sale of one hundred fifty shares of United Services Life Insurance Company stock and fifty-five shares of Pepsico Company stock valued by the parties on the date of execution of the note at $8,631.00.[2] Mr. Hubbell, however, paid only $4,655.00, or $3,976.00 less than the value of the stock. This "bargain" was to constitute additional interest on the note, according to the uncontradicted testimony of Mr. Robert Danek. (Mr. Hubbell is now deceased.)

The note in fact was not paid in one year. In August, 1970, the collateral was released in exchange for a $30,000.00 payment on the note. Mr. Robert Danek apparently received "extensions" for payment on the note but by April, 1973, had reduced the balance indicated by the face of the note to only $11,148.29.

The trial court ruled that the note was primarily a corporate obligation of Telephonic, Inc., was not affected by the stock transaction and was not usurious. The appellants claim on appeal that Telephonic, Inc. was not a primary maker on the note but was a guarantor, that the interest on the note in light of the stock transaction was usurious and that the individuals who signed as makers are entitled to assert the defense of usury. We agree.

We first examine the nature of the obligation under the note. On its face the note was clearly the personal obligation of the Robert Daneks and the Porters, who signed as comakers. The guarantors were the Richard Daneks and later, Telephonic, Inc. The trial court, however, ruled that the note was primarily a corporate obligation of Telephonic, Inc., because the money was used to establish the business. But Telephonic, Inc. was not even in existence at the time of execution of the note and endorsed only as a guarantor some time after the execution of the instrument.

Furthermore, there is the uncontradicted testimony of Robert Danek:

Q. Why did you sign your name on the note, then, for Telephonic, Inc., before it was actually incorporated?

A. We anticipated this corporation and Mr. Hubbell said that he wanted it.

Q. He said he wanted what?

A. He said he wanted the corporation to guarantee this note.

Q. Was there any discussion with Mr. Hubbell as to whether he would accept a note from Telephonic, Inc., a corporation?

A. Yes, there was quite a bit. We tried desperately to get this note in the name of Telephonic, Incorporated as the borrower. Mr. Hubbell would hear nothing of it. He insisted that Melvin Porter and myself do this note individually, and he would have the corporation guarantee it, but he would not have the corporation borrow the money. We tried desperately but he just wouldn't do it.

Therefore, we must conclude that the parties intended the note to be the personal ob-

---

1. See § 50–6–26, N.M.S.A.1953 (Supp.1975).

2. The United Services Life Insurance stock was owned by Robert Danek's parents and was transferred to Mr. Hubbell at an agreed value of $38.25 per share, or $5,737.00. The Pepsico stock was owned by the Melvin Porters and transferred at an agreed value of 52⅝ per share, or $2,894.00. There was a minor discrepancy between the agreed value and the market value testified to by a stock broker. The difference is immaterial to the issues before us.

ligation of the Robert Daneks and Porters. We so hold. Cf. *American Bank of Commerce v. Covolo*, 88 N.M. 405, 410–411, 540 P.2d 1294, 1299–1300 (1975).

■ The appellants also allege that the interest on the note is usurious. The defense of usury is not available to a corporation. § 50–6–26, N.M.S.A.1953 (Supp. 1975).[3] Since we have held that the individuals were the makers of the note the defense of usury can be raised.

The rates of interest are regulated by statute under § 50–6–16, N.M.S.A.1963:

Rates of interest allowed—Minimum charge.—The interest rate shall be the rate agreed to by the parties, except that no interest rate shall be higher than twelve per cent (12%) per annum computed upon unpaid balances for the actual elapsed time during which such balances respectively are unpaid where the evidence of indebtedness of the loan is not secured by collateral security, and shall not exceed ten per cent (10%) per annum computed upon unpaid balances for the actual elapsed time during which such balances respectively are unpaid where the evidence of indebtedness is secured by collateral security; . . ..

The appellants argue that if the stock transaction is considered, the interest rate on the loan for the one year is approximately 17%[4] and therefore usurious, whether the note was secured or unsecured. The Bank argues to the contrary that the interest should be calculated over the entire time during which the balance was unpaid which according to its calculations is six years. Under this theory, the interest rate is a permissible 4.32% with the profit from the stock transaction considered as interest and even less if this transaction is not considered. The trial

court held that the profit on the stock transaction did not constitute interest on the note and that the note was not usurious.

■ The trial court also found a novation in August, 1970, when the collateral was released. Yet there was no definite agreement to extend the note or to set a new maturity date and payment schedule. This finding of a novation by the trial court is not supported by substantial evidence and must be reversed. *Cantrell v. Lawyers Title Insurance Company*, 84 N. M. 584, 506 P.2d 90 (1973).

■ Since there was no new binding obligation or valid extension of the note, the term of the note must remain at the one-year period agreed to by the parties. The interest then must be calculated over that period and not the six years argued by the Bank.

■ Usury must exist at the inception of an agreement. *Hays v. Hudson*, 85 N. M. 512, 514 P.2d 31 (1973); *Armijo v. Henry*, 14 N.M. 181, 89 P. 305 (1907); 45 Am.Jur.2d Interest and Usury § 111, at 97 (1969). Other courts have disregarded the form and looked to the substance of a transaction in order to determine whether usury exists. *Starkovich v. Southwest Savings & Loan Ass'n*, 14 Ariz.App. 382, 483 P.2d 795 (1971) [citing *Seargeant v. Smith*, 63 Ariz. 466, 163 P.2d 680 (1945)]; *Burr v. Capital Reserve Corporation*, 71 Cal.2d 983, 80 Cal.Rptr. 345, 458 P.2d 185 (1969) [citing *Milana v. Credit Discount Co.*, 27 Cal.2d 335, 163 P.2d 869 (1945)]; Restatement of Contracts § 529 (1932); 45 Am.Jur.2d Interest and Usury § 112 (1969). An ostensibly independent and unrelated contract for the sale of property from the borrower to the lender at an inadequate price has rendered a loan usu-

---

3. A virtually identical statute was in effect at the time the note was executed. See ch. 87, § 8, [1967] N.M.Laws 656.

4. On the face of the note $60,000.00 is the principal. When the stock sale is considered, Hubbell bought the stock at $3,976.00 less

than the agreed value. This amount constituted additional interest on a net principal of $56,024.00 ($60,000.00–$3,976.00), or an additional 7.1% interest on the note. Thus, the approximate total interest is the 10% called for by the note plus 7% from the stock sale, or 17%, well in excess of the 12%.

rious in other jurisdictions if the sale is a condition of the loan and intended as a device to disguise usury. *Mission Hills Dev. Corp. v. Western Small Business Inv. Co.,* 260 Cal.App.2d 923, 67 Cal.Rptr. 505 (1968); cf. *Kessing v. National Mortgage Corporation,* 278 N.C. 523, 180 S.E.2d 823 (1971); Annot., 81 A.L.R.2d 1280, 1286 (1962). We will follow these principles in New Mexico. The stock sale in this case was a condition of the loan from Mr. Hubbell and according to the uncontradicted testimony of Mr. Robert Danek, the reduced price was to constitute additional interest. Usury was present in the transactions from the outset.

What then are the consequences? Under § 50–6–18, N.M.S.A.1953, knowingly charging an illegal interest results in forfeiture of the entire amount of interest. "Knowingly" has been interpreted by this court to require only the general intent of taking illegal interest by the lender rather than by any specific one. *Hays v. Hudson,* supra, 85 N.M. at 513, 514 P.2d at 32. There is no question of the presence of the requisite intent here.

Thus, all interest on the note is forfeited. The Robert Daneks and Porters received the benefit of $56,024.00 from the various transactions.[5] They have made payments to date of $57,547.22. Therefore, their obligation to the Bank is completed.

 The trial court also awarded $2,200.00 in attorney's fees to the Bank's attorneys. Under *Hays v. Hudson,* supra, reasonable attorney's fees are recoverable only to the extent necessary to enforce the legal portion of the obligation. At the time suit was commenced, the Bank had no legal cause of action against the defendants since the note was usurious and payment on the net principal of $56,024.00 had been made. Thus, the Bank's attorneys are not entitled to attorney's fees, and the or-

der of the trial court allowing attorney's fees is reversed.

 Finally, the Bank cross-appeals, alleging that there was no novation and thus the Richard Daneks should not be released as guarantors under the note. This claim becomes meaningless since we hold that the obligation to the Bank has been satisfied. Therefore, the guarantors are not liable under the note.[6]

The judgment of the trial court is reversed.

IT IS SO ORDERED.

OMAN, C. J., and SOSA, J., concur.

---

5. See supra note 3.

6. Telephonic, Inc. also guaranteed the note. Its liability is also at an end since we hold

the note has been satisfied. It most likely could defend on the grounds of usury since the comakers could raise the defense. See Annot., 63 A.L.R.2d 924, 957 (1959).